**Alexey T. ZACHARIN, Plaintiff-Appellant,**

v.

**UNITED STATES, Defendant-Appellee.**

No. 99-5086.

United States Court of Appeals, Federal Circuit.

June 13, 2000

Robert H. Koehler, Patton Boggs LLP, of Washington, DC, argued for plaintiff-appellant. With him on the brief was Michael J. Schaengold.

Grace Karaffa, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellant. With her on the brief were David W. Ogden, Acting Assistant Attorney General and Vito J. DiPietro, Director, and John Fargo, Assistant Director.

Before MICHEL, PLAGER, and BRYSON, Circuit Judges.

BRYSON, Circuit Judge.

Alexey T. Zacharin appeals the order of the Court of Federal Claims dismissing his patent infringement suit against the government. The trial court held that Mr. Zacharin's asserted patent was invalid under 35 U.S.C. § 102(b) because the patented invention was on sale more than one year prior to the filing of the patent application. We affirm.

I

Mr. Zacharin owns the rights to United States Patent No. 4,565,341 (the '341 patent). He conceived the invention of the '341 patent and reduced it to practice while working as an engineer at the Army's Armament Research and Development Command (ARRADCOM), which is responsible for developing new armaments for the Army.

In the mid–1970s, ARRADCOM began work on the Multi–Purpose Sub–Munition (MPSM) program. The goal of the MPSM program was to develop a warhead with nine stacked submunitions, or small bombs, that could be launched from a helicopter. The concept behind the proposed weapon system was that after launch, the warhead would detonate and spray the

submunitions on a target below. When released from the warhead, the submunitions would experience an airflow of up to 2600 feet per second. In order to direct the submunitions downwards, the designers of the system had to devise a means to stop their forward movement abruptly and force them to descend directly onto the target below. The Army determined that a ram air decelerator (RAD) would have to be attached to the submunitions to stop their forward movement and at the same time initiate the process of arming them so that they would detonate on contact with the target.

Mr. Zacharin was the engineer with primary responsibility for developing the fuze portion of the MPSM system. The engineer with primary responsibility for developing the RAD portion of the project was Saul Wasserman. Although Mr. Zacharin had no official responsibility for the design of the RAD, he was concerned about the progress of the MPSM program and therefore designed a triangular-shaped RAD (t-RAD) on his own time. Mr. Zacharin's t-RAD consisted of a fabric balloon-like device that would inflate when placed in a high-velocity airstream. Mr. Zacharin stitched his prototype t-RAD together on his wife's sewing machine and tested it on December 10, 1978, by attaching the t-RAD to the window of his car and driving the car at high speed.

Both parties agree that the t-RAD Mr. Zacharin tested on December 10, 1978, met every limitation of the claimed invention and that the invention was reduced to practice by that date. Mr. Zacharin disclosed his invention to several people involved in the MPSM program, including his immediate supervisor, the branch director, and Mr. Wasserman, with the hope that the t-RAD would be considered for use in the program.

By June 1979, the t-RAD had become one of four designs the Army was considering for use in the MPSM program. By November 1979, the choice of designs was narrowed to two—the t-RAD designed by Mr. Zacharin and a paracone design developed by Mr. Wasserman. The Army tested the performance of the two designs, and based upon the test the Army chose the t-RAD in January 1980.

The Army contracted with the Breed Corporation to aid in the development of the fuze and RAD for use in the MPSM program. The first contract related to the first two phases of the four-phase development program. On April 15, 1980, Breed was awarded a second contract, which related to the third phase of the program. That contract, referred to as the 0095 contract, required Breed to fabricate 6000 fuze systems and 6000 t-RADs for testing by the Army. The contract was a cost-plus-incentive-fee contract, which meant that Breed would be paid its costs plus a fee representing profit. Mr. Zacharin personally inspected the 6000 t-RAD units that Breed produced under the 0095 contract and accepted them on behalf of the Army.

In September 1980, Mr. Zacharin executed a Record of Invention and a Patent Disclosure Data Sheet, which he then submitted to the Patent Law Division of the ARRADCOM Legal Office. The ARRADCOM Invention Evaluation Committee decided that the t-RAD was an invention for which patent protection should be sought, and Harold H. Card, Jr., Chief Patent Counsel of the Patent Law Division, notified Mr. Zacharin of the decision. Mr. Card also explained to Mr. Zacharin that there was a backlog in the office and that filing might be delayed for more than a year. The application was submitted to the Patent and Trademark Office on September 24, 1981.

In April 1982, the Patent Law Division initiated a request for a Determination of Rights. It advocated that Mr. Zacharin should retain all rights in the patent. The

Chief of the Army's Patent Law Division rejected that suggestion and determined instead that any patent that issued would be subject to a nonexclusive, irrevocable, royalty-free license to the government.

Unsatisfied with that result, Mr. Zacharin appealed that determination to the Commissioner of Patent and Trademarks. The Commissioner found that Mr. Zacharin owned the invention and that the government was not entitled to a royalty-free license. Mr. Zacharin then revoked Mr. Card's power of attorney and obtained private counsel to complete the prosecution of the application. The '341 patent issued on January 21, 1986.

Mr. Zacharin subsequently brought an action against the United States under 28 U.S.C. § 1498, seeking compensation from the government for its use of the patented invention. The Court of Federal Claims granted the government's motion for summary judgment on the ground that the government had a license to use the claimed invention. This court vacated that order and remanded the case to the Court of Federal Claims for further proceedings. On remand, following a one-day trial, the court found that the invention was on sale more than one year before the application was filed and that all seven claims of the '341 patent were therefore invalid under 35 U.S.C. § 102(b).

## II

■ In *Pfaff v. Wells Electronics, Inc.*, 525 U.S. 55, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998), the Supreme Court held that a patent claim is invalid under the on-sale bar if two conditions are met: first, the invention must have been the subject of a commercial offer for sale more than one year before the patent application was filed; second, the invention must have been ready for patenting more than one year before the filing of the application. Reduction of the invention to practice is

sufficient to satisfy the second condition. *See id.* at 67, 119 S.Ct. 304; *Weatherchem Corp. v. J.L. Clark, Inc.*, 163 F.3d 1326, 1332, 49 USPQ2d 1001, 1006 (Fed.Cir. 1998).

The trial court ruled that Breed's acceptance of the 0095 contract constituted a commercial offer to sell a product that embodied the invention and occurred more than a year before Mr. Zacharin's patent application was filed. The trial court also found that the second prong of the *Pfaff* test was met because the invention was ready for patenting at the time of the offer for sale. Mr. Zacharin argued to the Court of Federal Claims that the Army's use of the t-RAD fell under the experimental use exception to the on-sale bar and that the contract with Breed therefore did not place the invention in the public domain. The trial court rejected that argument because the parties stipulated that the invention had been reduced to practice before the 0095 contract was awarded, and once an invention has been reduced to practice, it can no longer meet the experimental use exception. *See RCA Corp. v. Data Gen. Corp.*, 887 F.2d 1056, 1061, 12 USPQ2d 1449, 1453 (Fed.Cir.1989).

Before the trial court, the parties also stipulated that the 0095 contract obligated Breed to fabricate and deliver to the Army 6000 t-RADs, and that the t-RADs Breed was required to deliver embodied the invention of the asserted claims. Based on the evidence at trial, the court further found that the 0095 contract called for Breed to be paid its costs for producing the 6000 t-RADs plus a fee, the size of which would depend on the relationship between the anticipated and actual cost of producing the goods called for by the contract.

In light of the stipulations and the trial court's findings, Mr. Zacharin does not challenge the court's ruling that the t-RADs produced under the contract embod-

ied every limitation of the claims at issue. Nor, in light of the stipulations, does he argue that the "experimental use" exception to the on-sale doctrine is applicable in this case. Instead, he contends that the acceptance of the 0095 contract did not constitute a commercial offer to sell the invention, because the 0095 contract was not a commercial supply contract with fixed unit prices and a definite delivery schedule. According to Mr. Zacharin, the 0095 contract did not trigger the on-sale bar, because he was working cooperatively with the Army in evaluating the t-RAD for use in the MPSM program and Breed's role in that process was simply to fabricate the test models. Thus, he argues that Breed's acceptance of the 0095 contract was not a commercial offer for sale, but an agreement to support the Army's efforts by fabricating the t-RADs that the Army needed for testing purposes.

 We agree with the trial court that the 0095 contract was a commercial offer for sale that invalidated all seven claims of the '341 patent. A sale is "a contract between parties to give and pass rights of property for consideration which the buyer pays or promises to pay the seller for the thing bought or sold." *In re Caveney*, 761 F.2d 671, 676, 226 USPQ 1, 4 (Fed.Cir.1985). In this case, Breed contracted to fabricate 6000 t-RADs and deliver them to the Army. In fact, Mr. Zacharin inspected and accepted the t-RADs for the Army, implying that he could have rejected any of unacceptable quality. Thus, under the contract Breed manufactured the t-RADs and transferred all its rights in the fabricated t-RADs to the Army in exchange for a payment that guaranteed Breed that its costs would be covered in addition to some amount of profit.

This case is not one in which the inventor took his design to a fabricator "and pa[id] the fabricator for its services in fabricating a few sample products." *See*

*Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*, 182 F.3d 888, 891, 51 USPQ2d 1470, 1473 (Fed.Cir.1999). Rather, Mr. Zacharin disclosed his invention to a third party, the Army, with the hope and expectation that his t-RAD design would be used in the MPSM program, and the Army entered into a contract for the production of a large number of products embodying the invention. Mr. Zacharin placed no restrictions on the Army's use or disclosure of the design. He cannot now argue that this court should view the 0095 contract as a collaborative offer between him and the Army, after having earlier argued to the PTO in the rights determination that the Army had no rights to the invention of the '341 patent. Moreover, because Mr. Zacharin stipulated that the t-RAD had been reduced to practice before the 0095 contract was entered into, he cannot now argue that the purpose of the 0095 contract was testing of the t-RAD design.

The fact that the sale in question was made in the context of a research and development contract and that there was no fixed price set for the t-RADs does not suffice to avoid the on-sale bar. This court held in *RCA Corp. v. Data General Corp.*, 887 F.2d at 1062–63, 12 U.S.P.Q.2d at 1454–55, that a cost-plus contract to supply experimental systems incorporating an invention that was reduced to practice constituted an invalidating offer for sale, and that precedent is equally applicable to the contract at issue in this case. Likewise, the fact that the products sold to the Army were to be used for testing rather than as routine production units, is not sufficient to avoid the effect of the on-sale bar, as our predecessor court held in *General Electric Co. v. United States*, 228 Ct.Cl. 192, 654 F.2d 55, 59 & n. 6, 211 U.S.P.Q. 867, 871 & n. 6 (1981). A contract to supply goods is a sales contract, regardless of the means used to calculate payment and regardless of whether the goods are to be used for testing in a laboratory or for deployment in the field.

Finally, under this court's precedents, it is of no consequence that the sale was made by a third party, not by the inventor, *see Abbott Laboratories v. Geneva Pharmaceuticals, Inc.,* 182 F.3d 1315, 1318, 51 U.S.P.Q.2d 1307, 1309 (Fed.Cir.1999), or that the product was constructed and the sale made pursuant to the buyer's directions, *see Brasseler,* 182 F.3d at 891, 51 USPQ2d at 1473. The trial court therefore did not commit legal error in concluding that Breed's acceptance of the 0095 contract constituted a commercial sale of the invention that invalidated the '341 patent.

### III

Mr. Zacharin argues in the alternative that the government should be equitably estopped from asserting the on-sale bar as a defense because the government attorneys who filed the patent application were aware of the Breed contract and did not raise the on-sale-bar issue at the time of the application. The Court of Federal Claims rejected that argument on two grounds. First, the court found that, even assuming the government attorneys were aware of the facts surrounding the 0095 contract, Mr. Zacharin clearly had knowledge of that contract and thus was not ignorant of the true facts, which is one of the requirements of the traditional test for equitable estoppel. *See Rel–Reeves, Inc. v. United States,* 209 Ct.Cl. 595, 534 F.2d 274, 296–97 (1976). Second, the court ruled that even if Mr. Zacharin had satisfied the traditional test for equitable estoppel, he would not be entitled to preclude the government from asserting the on-sale bar defense, because allowing him to obtain compensation for the government's use of an invalid patent would provide him with a "money remedy that Congress has not authorized," contrary to the Supreme Court's decision in *Office of Personnel Management v. Richmond,* 496 U.S. 414, 426, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990).

We agree with the trial court that, based on the record in this case, the government may not be estopped from invoking the on-sale bar as a defense to Mr. Zacharin's compensation claim. Although the Supreme Court has not adopted a per se rule prohibiting the application of equitable estoppel against the government under any circumstances, it has made it clear that "the government may not be estopped on the same terms as any other litigant." *Heckler v. Community Health Servs.,* 467 U.S. 51, 60, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984). In particular, the Court has suggested that if equitable estoppel is available at all against the government some form of affirmative misconduct must be shown in addition to the traditional requirements of estoppel. *See Richmond,* 496 U.S. at 421, 110 S.Ct. 2465; *INS v. Miranda,* 459 U.S. 14, 19, 103 S.Ct. 281, 74 L.Ed.2d 12 (1982); *Schweiker v. Hansen,* 450 U.S. 785, 788, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981). While the Supreme Court has not squarely held that affirmative misconduct is a prerequisite for invoking equitable estoppel against the government, this court has done so, *see Henry v. United States,* 870 F.2d 634, 637 (Fed.Cir.1989); *Hanson v. Office of Personnel Management,* 833 F.2d 1568, 1569 (Fed.Cir.1987), as has every other court of appeals, *see Tefel v. Reno,* 180 F.3d 1286, 1303 (11th Cir.1999) (citing cases).

There is no evidence that any representative of the government gave Mr. Zacharin incorrect legal advice or engaged in any other affirmative misconduct regarding the 0095 contract. Although the government representatives did not advise Mr. Zacharin that the 0095 contract might be regarded as an invalidating offer to sell the invention, there is no evidence that they made any misrepresentations to Mr. Zacharin with regard to that contract or otherwise induced him to believe that the 0095 contract would not trigger the on-sale bar. Absent more, their failure to call his

attention to the possible legal consequences of the 0095 contract does not constitute the kind of affirmative misconduct that might be sufficient to give rise to an estoppel against the United States. Accordingly, we hold that the trial court properly declined to prohibit the government from asserting the invalidity of the '341 patent on the basis of the on-sale bar. In light of our ruling, we need not address the trial court's second ground for rejecting the equitable estoppel argument—that it is foreclosed by the rationale of the Supreme Court's decision in the *Richmond* case, which involved a claim for the payment of money from the public treasury contrary to a statutory appropriation, *see Burnside–Ott Aviation Training Ctr., Inc. v. United States*, 985 F.2d 1574, 1581 (Fed.Cir.1993).

*AFFIRMED.*