SPECIAL DEVICES, INC., Plaintiff,

v.

OEA, INC., Defendant.

OEA, Inc., Counterclaimant,

v.

Special Devices, Inc., Counterdefendant.

No. CV 99–03861 DT SHX.

United States District Court,
C.D. California.

Oct. 10, 2000.

Robert C. Weiss, Thomas J. Brindisi, Lawrence R. LaPorte, Lyon & Lyon, Los Angeles, CA, for Plaintiff.

Edward C. O'Connor, Stradling, Yocca, Carlson & Rauth, Newport Beach, CA, for Defendant.

ORDER **GRANTING** PLAINTIFF SPECIAL DEVICES, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT OF INVALIDITY OF U.S. PATENT NO. 5,404,263 UNDER 35 U.S.C. § 102(b)

TEVRIZIAN, District Judge.

## I. *Background*

### A. **Factual Summary**

This action is brought by Plaintiff Special Devices, Inc. ("Special Devices") against OEA, Inc. ("OEA") for declaratory relief of patent invalidity and non-infringement under 18 U.S.C. §§ 2201 and 2202. Before this Court is Special Device's motion for partial summary judgment of invalidity of claims 1–9 of U.S. Patent No. 5,404,263 under 35 U.S.C. § 102(b).

The following relevant facts are not disputed:

The subject matter of United States Patent No. 5,404,263 ("the '263 patent") is an all-glass header used in air-bag initiators, the small device that sets off, or "initiates," the explosion that results in the expansion of a vehicle's air bag.

The '263 patent includes 24 claims. Claims 1–9 are "device" claims and each reads directly on the header shown in Figure 3 of the '263 patent. Claim 1 is an independent claim and claims 2–9 depend directly or indirectly from claim 1 and add only minor limitations to claim 1. Claims 10–24 are "method claims" directed to the method of making an all-glass header and are not the subject of this motion.

OEA has only asserted that claims 1–9 of the '263 patent are infringed. (*See* OEA's Response to Interrogatory No. 1, attached as Ex. 12 to Declaration of Thomas J. Brindisi.)

In 1987, OEA set out to develop a header for an air-bag initiator that it could manufacture at a reduced cost. (*See* Brindisi Decl., Ex. 1.) One cost-saving measure OEA targeted was to use an "all-glass" header wherein no ceramic chip is placed at the header's top surface. (*See id.*)

At least as early as 1990, OEA contacted Coors Ceramics, Co. ("Coors"), to see if it could manufacture the desired all-glass header in large quantities. (*See* Brindisi Decl., Ex. 8 at p. 99, ¶ 4.) OEA provided to Coors a drawing containing specifications for the header. (*See id.* at p. 100, ¶ 5.) Coors then created a 2/11/91 specification drawing for the OEA header based on an OEA drawing, Dwg. No. 4510415. (*See* Brindisi Decl., Ex. 2.)

The header of the 2/11/91 specification drawing is identical in all material respects to the one shown in Fig. 3 of the '263 patent. (*See* Brindisi Decl., Ex. 2 and Ex. 5 at p. 33.)

On February 22, 1991, Coors delivered 100 pieces for OEA to test. (*See* Brindisi Decl., Ex. 4 at p. 30.; *see also* Brindisi Decl., Ex. 3 at p. 28.) Based on evaluation of these units, OEA decided Coors was a suitable commercial vendor, and on April 19, 1991, OEA sent Coors a proposal requesting Coors to manufacture at least 50% of OEA's commercial requirements. (*See* Brindisi Decl., Ex. 8 at p. 97.) On May 2, 1991, Coors sent OEA a letter agreeing to the proposal. (*See id.* at p. 89.)

On June 4, 1991, OEA ordered two lots from Coors, totaling 20,000 units for delivery scheduled to begin in mid- to lateJuly, 1991. (*See id.* at pp. 83–86.)

On July 10, 1991, Coors proposed the general outline for an ongoing requirements contract for millions of units per year. (*See id.* at pp. 90–92.) The proposal included a term stating that "OEA will agree to purchase from Coors Ceramics a minimum number of initiator headers or a percentage of headers required per year at prices to be agreed upon by the parties." (*Id.*)

On July 23, 1991, OEA notified Coors that the proposed terms were acceptable, and asked Coors to prepare a formal agreement. (*See id.* at p. 93.) Two years later, around July of 1993, OEA apparently stopped buying headers from Coors, and

"thank[ed] Coors for providing the header assemblies during the past two years." (*See* Brindisi Decl., Ex. 7.)

On August 27, 1992, OEA and Coors filed separate patent applications directed to all-glass headers and methods of making them. Both of the applications were written and prosecuted by the law firm of Sheridan & Ross, and both included drawings of an all-glass header. The OEA application became the '263 patent and the Coors application became United States Patent No. 5,243,492 ("the '492 patent"). The header shown in Figure 3 of the '263 patent was the same in all material respects to the header shown in Figure 4 of the '492 patent. (*See* Brindisi Decl., Ex. 5 at p. 33 and Ex. 6 at p. 46.) These headers shown in the '263 patent and the '492 patent drawings were also the same as the header shown in the Coors' 2/11/91 specification drawing. (*See* (*See* Brindisi Decl., Ex. 2.))

Although Sheridan & Ross was aware of the OEA/Coors commercial transactions, having attended at least one OEA/Coors meeting before filing the patents (*see* Brindisi Decl., Ex. 8 at pp. 72–73, ¶ 13), they never informed the Patent and Trademark Office ("PTO") of the OEA/Coors commercial transaction in connection with either application.

On September 7, 1993, the '492 patent issued with a number of narrow claims. The '263 patent eventually issued on April 4, 1995.

Shortly after the '263 patent issued, Coors decided that the claims of the '263 patent covered subject matter that Coors believed it owned. Coors then obtained separate attorneys.

On September 5, 1995, Coors' new attorneys filed a reissue application based on the '492 patent. (*See* Brindisi Decl., Ex. 8 at pp. 61–65.) In prosecuting the reissue application, Coors' new attorneys recognized that Coors' sales and offers to OEA, the knowledge of which had been withheld from the PTO by Sheridan & Ross, were

material and should have been submitted pursuant to the duty of candor. (*See* 37 C.F.R. § 1.56.) As part of the reissue application, the three inventors of the Coors '492 patent told the following to the PTO under penalty of perjury:

... We do know that there were several transactions involving products having features of the invention with OEA, Inc., a corporate entity more than one year prior to the filing date of said application.... [A] transaction shown in the documents of Exhibit 2 hereto involved 2,000 products at a unit price of $10 and 18,000 products at unit prices between $3.50 and $3.25, respectively. We believe that these products were to be used for experimental purposes by OEA, Inc. We did not make the information on these transactions available in our original application, because we were not advised or aware of at that time as to what might constitute a sale under 35 U.S.C. § 102(b).

(*See* Brindisi Decl., Ex. 8 at p. 69, ¶ 6.)

Coors personnel told the PTO they thought OEA used most of the 20,000 headers in "identifying sources of material, and developing written procedures and controls to insure that [Coors] was capable of making the products on a commercial basis." (*See* Brindisi Decl., Ex. B.) Coors made no restrictions on resale of the units, (*see* Ryser Decl., ¶ 7), and even OEA's first purchase order to Coors had a "xx" marked in a box labeled "For resale—not subject to Colorado Retailers and Occupation tax." (*See* Brindisi Decl., Ex. 8 at p. 82.)

Coors attempted to characterize the OEA/Coors commercial transactions as merely experimental, preliminary or part of a joint venture, but these arguments were all unavailing and subsequently rejected by the PTO.

On August 22, 1996, seeking to intervene or provoke an interference, OEA filed a protest to Coors' reissue application. (*See* Brindisi Decl., Ex. 8 at pp. 94–97.)

OEA admitted in its protest that claims 51–56 in the Coors reissue application were "identical" to claims 1–3 and 10–12 of the '263 patent. (*See id.* at pp. 95–96.) OEA also noted claims 50 and 57 "read on the disclosure of the ['263] patent". (*Id.*) Coors likewise admitted that the claims corresponded. (*See id.* at pp. 66–67.)

As part of its protest, OEA re-introduced and relied on most of Coors' evidence of the 1991 OEA/Coors commercial transactions. (*See id.* at p. 102.)

On April 29, 1997, the PTO rejected all the claims, including the claims copied from the '263 patent, as having been on sale under Section 102(b): "Claims 1–58 are rejected under 35 U.S.C. 102(b) based upon a public use or sale of the invention. This is based upon applicants' own declarations and the exhibits mentioned."

Coors continued its reissue application in an attempt to obtain allowance of the claims. In late 1999, however, it abandoned the reissue, at which point the rejections still stood. (*See id.* at pp. 130–33.)

OEA's President, Charles Kafadar, stated that the April 19, 1991, letter of intent and June 4, 1991, Purchase Orders "clearly show that sample products were produced by [Coors] from an OEA drawing." (*Id.* at p. 100, ¶ 5.) Gary C. Ryser, who was OEA's Director of Engineering, Quality Control and Production, personally saw units from the lots of 20,000 headers delivered by Coors to OEA. (*See* Ryser Decl., ¶¶ 3–6.) Mr. Ryser confirms that the 20,000 Coors headers sold to OEA in 1991 were all-glass with no gaps between the insulator and eyelet, were coaxial, had two electrode pins, and stainless steel eyelets. (*See id.*)

Around early 1997, Special Devices began developing a header it named the Advanced Glass–Seal Initiator, or "AGI."

On October 6, 1997, OEA's original patent attorney, David F. Zinger, sent a warning letter to Special Devices about the '263 patent and asking "that the proprietary rights of OEA covered by this

patent be respected." (*See* Brindisi Decl., Ex. 11.) After another threat letter, counsel for Special Devices wrote back on May 22, 1998, raising a number of issues. (*See id.*) On July 1, 1998, Mr. Zinger wrote that OEA was investigating certain inventorship issues, but never disclosed the 1991 OEA/Coors transactions. *See id.* On April 9, 1999, after more communications and a final ultimatum by OEA, Special Devices filed this lawsuit. On March 21, 2000, OEA served a counterclaim alleging willful infringement.

### B. Procedural Summary

On April 9, 1999, Special Devices filed a Complaint for Declaratory Relief of Patent Invalidity and Non–Infringement with this Court.

On October 8, 1999, Special Devices filed a Response to this Court's Order to Show Cause Re Dismissal for Lack of Prosecution.[1]

On October 27, 1999, OEA filed a Stipulation to Extend Time to Answer or Otherwise Respond to the Complaint pursuant to Local Rule 3.11.1.

On February 29, 2000, this Court entered an Order Granting OEA's Request for Judicial Notice and Denying OEA's Motion to Dismiss for Lack of Subject Matter Jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).

On March 21, 2000, OEA filed its Answer, Affirmative Defenses, Counterclaims and Demand for Jury Trial with this Court.

On April 10, 2000, Special Devices filed its Reply to OEA's Counterclaims and Affirmative Defenses as well as a Demand for Jury Trial.

On September 13, 2000, Special Devices filed the Motion for Partial Summary Judgment of Invalidity Under 35 U.S.C. § 102(b) presently before the Court.

On September 25, 2000, OEA filed a Motion for Summary Adjudication of the Issue of Patent Infringement which is currently scheduled to be heard by this Court on October 23, 2000.

## II. DISCUSSION

### A. Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is proper only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56. The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the moving party satisfies the burden, the party opposing the motion must set forth specific facts showing that there remains a genuine issue for trial. *See id.*; Fed R. Civ. P. 56(e). It may not rely on "mere allegations or denials of the adverse party's pleadings." Fed.R.Civ.P. 56(*o*).

A non-moving party who bears the burden of proof at trial to an element essential to its case must make a showing sufficient to establish a genuine dispute of fact with respect to the existence of that element of the case or be subject to summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Such an issue of fact is a genuine issue if it reasonably can be resolved in favor of either party. *See Anderson*, 477 U.S. at 250–51, 106 S.Ct. 2505. The non-movant's burden to demonstrate a genuine issue of material fact increases when the factual context renders her claim implausible. *See Matsushita Electrical Industrial Co. v. Zenith Radio*

---

1. A copy of the file-stamped Complaint was sent to, but not served on, Defendant on April 12, 1999. Subsequently, Plaintiff served the Complaint and Summons upon Defendant's attorney on October 7, 1999.

*Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Thus, mere disagreement or the bald assertion that a genuine issue of material fact exists, no longer precludes the use of summary judgment. *See Harper v. Wallingford*, 877 F.2d 728 (9th Cir.1989); *California Architectural Building Products, Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987), *cert. denied*, 484 U.S. 1006, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988).

If the moving party seeks summary judgment on a claim or defense on which it bears the burden of proof at trial, it must satisfy its burden by showing affirmative, admissible evidence.

Unauthenticated documents cannot be considered on a motion for summary judgment. *Hal Roach Studios v. Richard Feiner and Co.*, 896 F.2d 1542, 1550 (9th Cir.1989).

On a motion for summary judgment, admissible declarations or affidavits must be based on personal knowledge, must set forth facts that would be admissible evidence at trial, and must show that the declarant or affiant is competent to testify as to the facts at issue. FED. R. CIV. P. 56(e). Declarations on "information and belief" are inappropriate to demonstrate a genuine issue of fact. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989).

**B. Analysis**

In its motion for summary judgment now before this Court, Special Devices argues that certain sales and offers for sale of claims 1–9 set forth in the '263 patent were made more than one year prior to the patent's filing date, thereby invalidating the '263 patent pursuant to 35 U.S.C. § 102(b).

Section 102(b), the so-called on-sale bar to a valid patent, provides in pertinent part that a person is entitled to a patent unless "the invention was ... on sale in this country, more than one year prior to the date of the application for patent in the United States...." The Supreme Court

has held "that the on-sale bar of § 102(b) applies if, prior to the critical date, a product embodying the patented invention was 'the subject of a commercial offer for sale .... [, and] the invention [was] ready for patenting.'" *Brasseler U.S.A. I. L.P. v. Stryker Sales Corp.*, 182 F.3d 888, 890 (Fed.Cir.1999) (quoting *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67, 119 S.Ct. 304, 311–12, 142 L.Ed.2d 261 (1998)).

Here, it is undisputed that the '263 patent's effective filing date is August 27, 1992. Therefore, August 27, 1991, is the critical date for the purposes of applying Section 102(b)'s on-sale bar to the '263 patent.

■ First, this Court shall address whether the subject of claims 1–9 of the '263 patent was the subject of a commercial offer for sale prior to August 27, 1991. "A sale is 'a contract between parties to give and pass rights of property for consideration which the buyer pays or promises to pay the seller for the thing bought or sold.'" *Zacharin v. United States*, 213 F.3d 1366, 1370 (Fed.Cir.2000) (quoting *In re Caveney*, 761 F.2d 671, 676 (Fed.Cir.1985)).

Here, several independent circumstances might constitute offers for sale prior to the critical date of August 27, 1991. The Court will examine them in turn. First, it is undisputed that on February 22, 1991, Coors delivered 100 pieces for OEA to test. (*See* Brindisi Decl., Ex. 4 at p. 30.; *see also* Brindisi Decl., Ex. 3 at p. 28.) It is also undisputed that these pieces were constructed according to specifications provided by OEA to Coors in Dwg. No. 4510415 which is identical in all material respects to the one shown in Fig. 3 of the '263 patent. (*See* Brindisi Decl., Ex. 2 and Ex. 5 at p. 33.). (*See* Brindisi Decl., Ex. 2.) However, it is not clear from these undisputed facts whether or not Coors provided these 100 test units in exchange for consideration. Therefore, this Court cannot conclude as a matter of law that Coors' provision of the 100 test

units did in fact constitute a sale as defined by the *Zacharin* Court.

█ Nevertheless, additional undisputed facts do support a finding by this Court that a commercial offer for sale of the subject of claims 1–9 of the '263 patent had occurred prior to the critical date. Specifically, it is undisputed that based on an evaluation of the 100 test units, OEA decided Coors was a suitable commercial vendor, and on April 19, 1991, OEA sent Coors a proposal requesting Coors to manufacture at least 50% of OEA's commercial requirements. (*See* Brindisi Decl., Ex. 8 at p. 97.) It is also undisputed that on May 2, 1991, Coors sent OEA a letter agreeing to the proposal. (*See id.* at p. 89.)

It is further undisputed that on June 4, 1991, OEA ordered two lots from Coors, totaling 20,000 units for delivery scheduled to begin in mid- to late July, 1991. (*See* id. at pp. 83–86.)

Finally, it is undisputed that on July 10, 1991, Coors proposed the general outline for an ongoing requirements contract for millions of units per year. (*See id.* at pp. 90–92.) The proposal included a term stating that "OEA will agree to purchase from Coors Ceramics a minimum number of initiator headers or a percentage of headers required per year at prices to be agreed upon by the parties." (*Id.*) On July 23, 1991, OEA notified Coors that the proposed terms were acceptable, and asked Coors to prepare a formal agreement. (*See id.* at p. 93.)

In light of the foregoing undisputed facts, this Court finds as a matter of law that the letters from OEA to Coors on April 19, 1991, and June 4, 1991, as well as Coors' proposal of an ongoing requirements contract on July 10, 1991, constitute three separate commercial offers for sale, all of which occurred prior to the critical date.

OEA argues that the sales which form the basis of the instant motion for summary judgment should not be considered

as commercial offers for sale under *Pfaff* because they were merely sales by a supplier to the inventor and were used merely for experimentation and testing. To support these propositions, OEA relies on *M & R Marking Systems, Inc. v. Top Stamp, Inc.*, 926 F.Supp. 466 (D.N.J.1996), and *LaBounty Mfg., Inc. v. United States Int'l Trade Com'n*, 958 F.2d 1066 (Fed.Cir. 1992), respectively.

First of all, only the 100 units delivered to OEA by Coors on February 22, 1991, have been characterized as "test" units and this Court has already found that there are not sufficient facts to support a conclusion that those units were the subject of a commercial offer for sale.

Secondly, in *M & R Marking Systems,* the court applied the totality of the circumstances test to determine whether the on-sale bar of 35 U.S.C. § 102(b) invalidated the patent at issue there. *See M & R Marking Systems,* 926 F.Supp. at 470. However, two years later the Supreme Court explicitly rejected the totality of the circumstances test in *Pfaff. See Pfaff,* 525 U.S. at 65–67, 119 S.Ct. at 311. Similarly, *LaBounty* was issued six years before *Pfaff.* And, the *LaBounty* Court's holding that experimental uses were an exception to the on-sale bar would appear not to be prevailing authority in light of *Zacharin v. United States,* 213 F.3d 1366 (Fed.Cir. 2000), which rejected this argument even though it did not expressly mention *LaBounty* in doing so.

In *Zacharin,* the Federal Circuit invalidated a patent held by a former Army weapons engineer. The *Zacharin* Court found that a contract between the Army and a manufacturer to deliver the patented product for testing prior to the patent's critical date invalidated the patent under 35 U.S.C. § 102(b).

The *Zacharin* Court held that "the fact that the products sold to the Army were to be used for testing rather than as routine production units, is not sufficient to avoid the effect of the on-sale bar ...." *Zacha-*

*rin,* 213 F.3d at 1369. And, while OEA does not argue that the lack of a definite price in these offers renders them non-commercial, this fact does not negate their commercial nature either. "A contract to supply goods is a sales contract, regardless of the means used to calculate payment and regardless of whether the goods are to be used for testing in a laboratory or deployment in the field." *Zacharin,* 213 F.3d at 1370.

Likewise, OEA's argument that the transactions cannot constitute a sale because they were not to the public but by a potential supplier to a patentee is unavailing. *See Brasseler U.S.A. I. L.P. v. Stryker Sales Corp.,* 182 F.3d 888, 891 (Fed.Cir. 1999) (holding that a transaction does not have to be made to the ultimate users of a product to constitute a § 102(b) sale). "[I]t is of no consequence that the sale was made by a third party, not the inventor...." *Zacharin,* 213 F.3d at 1371 (citing *Abbott Lab. v. Geneva Pharm., Inc.,* 182 F.3d 1315, 1318 (Fed.Cir.1999)). And finally, it is irrelevant "that the product was constructed and the sale made pursuant to [OEA's] directions...." *Zacharin,* 213 F.3d at 1371 (citing *Brasseler,* 182 F.3d at 891).

■ Next, the Court will examine whether claims 1–9 of the '263 patent were ready for patenting more than one year before the filing of the application on August 27, 1992. This condition

> may be satisfied in at least two ways: by proof of reduction to practice before the critical date; or by proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention.

*Pfaff,* 525 U.S. at 67–68, 119 S.Ct. at 312.

■ Special Devices contends that the undisputed facts support a conclusion that claims 1–9 of the '263 patent were ready for patenting prior to the critical date be-

cause they had been reduced to practice before then. This Court agrees.

As stated above, it is undisputed that OEA provided to Coors a drawing containing specifications for the header. (*See* Brindisi Decl., Ex. 8 at p. 100, ¶ 5.) It is also undisputed that Coors then created a 2/11/91 specification drawing for the OEA header based on an OEA drawing, Dwg. No. 4510415. (*See* Brindisi Decl., Ex. 2.)

Finally, and most importantly, it is undisputed that the header that is the subject of the 2/11/91 specification drawing is identical in all material respects to the one shown in Fig. 3 of the '263 patent. (*See* Brindisi Decl., Ex. 2 and Ex. 5 at p. 33.) And, it is undisputed that claims 1–9 of the '263 patent read directly on the header shown in Fig. 3 of the '263 patent. As a result, this Court can only conclude as a matter of law that claims 1–9 of the '263 patent were ready for patenting on February 11, 1991, more than six months prior to the critical date.

Based on this Court's conclusions as a matter of law that claims 1–9 of the '263 patent were the subject of commercial offers for sale prior to the critical date and that claims 1–9 of the '263 patent were ready for patenting prior to the critical date, claims 1–9 of the '263 patent are accordingly found to be invalid pursuant to the on-sale bar of 35 U.S.C. § 102(b).

### III. CONCLUSION

Based on the foregoing, the Court hereby GRANTS Plaintiff Special Devices, Inc.'s Motion for Partial Summary Judgment of Invalidity of U.S. Patent No. 5,404,263 under 35 U.S.C. § 102(b).

IT IS SO ORDERED.