**EZ DOCK, INC., Plaintiff–Appellant,**

v.

**SCHAFER SYSTEMS, INC.,
Defendant–Appellee.**

No. 00–1443.

United States Court of Appeals,
Federal Circuit.

Jan. 15, 2002.

Rehearing and Rehearing En Banc
Denied Feb. 22, 2002.

Daniel J. Maertens and Lora Esch Mitchell Fredrikson & Byron, P.A., of Minneapolis, MN.

Derek J. Vandenburgh, Merchant & Gould, P.C, of Minneapolis, MN, argued for defendant-appellee. With him on the brief were Douglas J. Williams; and Gregory C. Golla.

Before MAYER, Chief Judge, RADER and LINN, Circuit Judges.

RADER, Circuit Judge.

On summary judgment, the United States District Court for the District of Minnesota declared EZ Dock, Inc.'s United States Patent No. 5,281,055 (the '055 patent) invalid due to an on-sale bar. Because the district court improperly resolved issues of fact against EZ Dock on summary judgment, this court vacates and remands.

## I.

This case features a polyethylene floating dock. Marinas and homeowners with waterfront properties typically use floating docks for mooring boats. Floating docks typically consist of metal or foam flotation cores. Concrete shells cover these flotation cores to form dock modules. Wood or other suitable materials generally cover the concrete shells to form the dock. Cables or springs then connect these dock sections to hold them together and to allow them to flex under stress.

McPherson D. Moore, Polster, Lieder, Woodruff & Lucchesi, L.C., of St. Louis, MO, argued for plaintiff-appellant. With him on the brief was Douglas E. Warren. Of counsel were Michael Kovac, Polster, Lieder, Woodruff & Lucchesi, L.C.; and

This type of dock, however, deteriorates under severe weather conditions. With time, the cable or spring connections loosen and leave unsafe gaps between the dock sections. To overcome this deterioration, some manufacturers offer plastic

docks. However, plastic docks often come in many pieces. These plastic docks pose difficulties in assembly.

In October 1989, Jack Neitzke and Clifton Vierus, both of Winona, Minnesota, began designing a floating dock made of polyethylene. Unlike earlier plastic docks, their design contained few parts. During this time, Mr. Neitzke ran an office supply store and a marina on the Mississippi river-

er. Mr. Vierus operated a nightclub across the street. Neither Mr. Neitzke nor Mr. Vierus had any prior experience in dock design. After several months of collaboration, Mr. Neitzke and Mr. Vierus settled on a design. Their design featured uniform molded dock sections coupled together with rubber male-type anchors which fit into female-type receiving sockets. These couplers were shaped like a dog bone:

After Mr. Neitzke and Mr. Vierus settled on the design, Mr. Vierus began building a mold for the dock section. In early 1991, Mr. Neitzke and Mr. Vierus entered into an agreement with Winnebago Industries to build some dock sections using Mr. Vierus' mold. Mr. Vierus' mold, however, would not work with polyethylene. Mr. Neitzke and Mr. Vierus thus spent several months adjusting the mold to accommodate Winnebago's polyethylene manufacturing processes.

In May 1991, Winnebago gave Mr. Neitzke and Mr. Vierus sixty-four dock sections, produced with Mr. Neitzke's and Mr. Vierus' mold. Mr. Neitzke first tested some dock sections by floating them in the Mississippi river. After determining that they would float, he installed numerous dock sections at his marina sometime in late May or early June 1991.

At about the same time, Larry Greden brought a copier to Mr. Neitzke's office

supply store for repair. Mr. Neitzke was storing several dock sections near the store's front windows at the time. Mr. Greden asked store employees about the dock. The employees directed Mr. Greden to Mr. Neitzke. Mr. Greden explained that he wished to buy one of Mr. Neitzke's docks as a Father's Day gift to install at his father's residence, Bass Camp, on the other side of the Mississippi river. Bass Camp experiences heavier boat traffic and more turbulent water flow than Mr. Neitzke's marina. Mr. Neitzke agreed to sell Mr. Greden two dock sections for $758.43, or 75% of the final retail price for the same dock system. Mr. Greden purchased the dock on June 13, 1991.

Mr. Neitzke installed the dock system at Bass Camp at no charge and included a gangplank, connectors, and all hardware also at no charge. In return, Mr. Greden agreed to allow Mr. Neitzke and Mr. Vierus to inspect the dock and replace or re-

pair any part as needed. Mr. Neitzke visited the dock between four and six times during the summer of 1991 and made a repair at no charge to Mr. Greden. In addition, Mr. Vierus visited the dock between four to six times and made several repairs at no charge. The dock remained at Bass Camp until late 1999 when Mr. Greden sold it to Schafer Systems, Inc. (Schafer) for $1000 and two replacement docks.

The dock that Mr. Neitzke sold to Mr. Greden on June 13, 1991, had rectangular shaped pylons within its structure. Pylons are basically pockets formed in the underside of the dock. On the water, these pylons trap air to keep the dock afloat even when damage to the dock allows water to enter the molded cavities.

Several months after selling the dock to Mr. Greden, Mr. Vierus and Mr. Neitzke evaluated several docks with rectangular shaped pylons after testing them in the Mississippi river. They discovered that the rectangular shaped pylons did not mold properly and eventually caused leaks. Mr. Vierus and Mr. Neitzke thus changed the pylon shape from rectangular to frustoconical as recited and claimed in the '055 patent.

On July 17, 1992, Mr. Vierus and Mr. Neitzke applied for a patent on their polyethylene dock. Mr. Vierus and Mr. Neitzke also formed EZ Dock and assigned all patent rights to their company. The United States Patent and Trademark Office issued the '055 patent January 25, 1994. Claims 1 and 8 recite:

1. A floating dock, comprising:

at least two docking members having top and bottom surfaces, each docking member containing a plurality of female-type receiving sockets spaced along the perimeter of the top and bottom surfaces of the docking member; and, a generally symmetrical male-type anchor with a pair of flanges, each flange being positionable within a receiving socket of one of the docking members for securing the docking members together in a flexible manner.

8. A floating dock, comprising:

a docking member with top, bottom and side surfaces defining a hollow cavity and a generally frustoconically shaped pylon within the cavity extending from the top surface to the bottom surface.

In 1997, Schafer made several unsuccessful attempts to negotiate a license under the '055 patent from EZ Dock. Schafer then began selling its own floating dock system, "Connect–a–Dock." On November 2, 1998, EZ Dock filed suit against Schafer for, *inter alia*, infringement of the '055 patent. Schafer counterclaimed for summary judgment of invalidity, noninfringement, and unenforceability due to alleged inequitable conduct during prosecution of the '055 patent.

The district court granted Schafer summary judgment of invalidity. The district court determined that the dock claimed in the '055 patent was on sale in this country more than one year before July 17, 1992, the date on which Mr. Neitzke and Mr. Vierus filed their patent application. *EZ Dock, Inc. v. Schafer Systems, Inc.*, No. 98–2364 (D.Minn. May 8, 2000). EZ Dock appeals. This court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## II.

■ This court reviews a district court's grant of summary judgment without defer-

ence. *Conroy v. Reebok Int'l, Ltd.,* 14 F.3d 1570, 1575, 29 USPQ2d 1373, 1377 (Fed.Cir.1994). Summary judgment requires a determination that the record contains "no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). In other words, after reviewing all the facts in a light most favorable to the nonmoving party, this court will only affirm a grant of summary judgment if no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

■ The Patent Act endows patents with a presumption of validity. 35 U.S.C. § 282 (1994). The Act also prevents issuance of any patent for an invention that was publicly used or on-sale in the United States more than one year before the date on which the patent application was filed. 35 U.S.C. § 102(b) (1994). Thus, an accused infringer may overcome a patent's presumption of validity by presenting clear and convincing evidence of facts showing that the patented device was on-sale before such critical date. *Massey v. Del Lab.,* 118 F.3d 1568, 1573, 43 USPQ2d 1367, 1370 (Fed.Cir.1997).

■ In *Pfaff v. Wells Elecs., Inc.,* 525 U.S. 55, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998), the Supreme Court recently set forth a two-part test for application of the on-sale bar. The bar applies when an invention is both the subject of a commercial offer for sale and ready for patenting before the critical date. *Pfaff,* 525 U.S. at 67, 119 S.Ct. 304. The Supreme Court also explained that the second condition ready for patenting "may be satisfied in at least two ways: by proof of reduction to practice before the critical date; or by proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." *Id.* at 59, 119 S.Ct. 304.

Before the Supreme Court's decision in *Pfaff,* this court used a multifactor, "totality of the circumstances" test to enforce the on-sale bar. *See, e.g., Micro Chem., Inc. v. Great Plains Chem. Co.,* 103 F.3d 1538, 1544, 41 USPQQ 2d 1238, 1243 (Fed.Cir. 1997) ("all of the circumstances surrounding the sale or offer to sell, including the stage of development of the invention and the nature of the invention, must be considered and weighed against the policies underlying section 102(b)"). In *Pfaff,* the Supreme Court determined that the "totality of circumstances" test was unnecessarily vague and "seriously undermine[d] the interest in certainty." *Pfaff,* 525 U.S. at 66 & n. 11, 119 S.Ct. 304. Therefore, this court now "follows the Supreme Court's two-part test without balancing various policies according to the totality of the circumstances." *Weatherchem Corp. v. J.L. Clark, Inc.,* 163 F.3d 1326, 1333, 49 USPQ2d 1001, 1006 (Fed.Cir.1998).

■ This court has repeatedly stressed that evidence of experimental use does not give rise to a free-standing doctrinal exception to statutory bars, but instead operates to negate application of section 102(b):

> [I]t is incorrect to impose on the patent owner, as the trial court in this case did, the burden of proving that a "public use" was "experimental." These are not two separable issues. It is incorrect to ask: "Was it a public use?" and then "Was it experimental?" Rather the court is faced with a single issue: Was it a public use under 102(b)?

*TP Labs., Inc. v. Prof'l Positioners, Inc.*, 724 F.2d 965, 971–72, 220 USPQ 577, 582 (Fed.Cir.1984); *Monon Corp. v. Stoughton Trailers Inc.*, 239 F.3d 1253, 1258, 57 USPQ2d 1699, 1703 (Fed.Cir.2001). Because adequate proof of experimentation negates a statutory bar, the focus remains throughout the inquiry on application of the statutory bar itself.

 This focus on the requirements for a statutory bar, however, could raise questions about the effect of the Supreme Court's recent clarifications of the standards for a statutory bar on the proof of experimentation adequate to negate the bar. In *Pfaff*, the Supreme Court expressly preserved the experimental use or sale negation of the section 102 bars: "Nevertheless, an inventor who seeks to perfect his discovery may conduct extensive testing without losing his right to obtain a patent for his invention—even if such testing occurs in the public eye. The law has long recognized the distinction between inventions put to experimental use and products sold commercially." *Pfaff*, 525 U.S. at 64, 119 S.Ct. 304. Experimentation evidence includes "tests needed to convince [the inventor] that the invention is capable of performing its intended purpose in its intended environment." *Gould Inc. v. United States*, 217 Ct.Cl. 167, 579 F.2d 571, 583, 198 USPQ 156, 167 (1978); *Kolmes v. World Fibers Corp.*, 107 F.3d 1534, 1540, 41 USPQ2d 1829, 1833 (Fed. Cir.1997) ("testing was ... required in such an environment in order to ensure that the invention would work for its intended purpose"). Indeed in *Pfaff*, the Supreme Court reiterated its guidance in *City of Elizabeth v. American Nicholson Pavement Co.*, 97 U.S. 126, 137, 24 L.Ed. 1000 (1877), that an inventor does not inappropriately delay filing "by a bona fide effort to bring his invention to perfection, or to ascertain whether it will answer the purpose intended." *Pfaff*, 525 U.S. at 64–65, 119 S.Ct. 304. Thus, the Supreme Court and this court apply the experimental use negation without conflict with the "ready for patenting" prong of the new on-sale bar test. Indeed as noted earlier, the Supreme Court acknowledged that a litigant may show readiness for patenting with evidence of reduction to practice. Like evidence of experimentation sufficient to negate a bar, reduction to practice involves proof that an invention will work for its intended purpose. *Scott v. Finney*, 34 F.3d 1058, 1061, 32 USPQ2d 1115 (Fed. Cir.1994). Even beyond this overlap of the experimental use negation and the ready for patenting standard, however, the Supreme Court explicitly preserved proof of experimentation as a negation of statutory bars.

 After Schafer established its *prima facie* case that the '055 patent was invalid due to an on-sale bar, EZ Dock put forth evidence to negate that evidence by showing that its sale to Mr. Greden was experimental. When Mr. Greden purchased his dock, EZ Dock was not yet selling any docks. Mr. Neitzke did not have a "for sale" sign, brochure, or any other markings to indicate that the docks he had in his office supply store were for sale. Rather, Mr. Greden initiated the purchase of the dock. Mr. Greden did not pay full market price for the dock. Moreover Mr. Neitzke added free equipment and free installation to the price he did charge Mr. Greden. This evidence creates a genuine issue regarding the factual support for whether the inventors offered their invention for a commercial sale under market conditions in accordance with the first part of the *Pfaff* test.

By other actions, the inventors showed that their sale was experimental rather

than premature commercial exploitation of their invention. *Cont'l Plastic Containers v. Owens Brockway Plastic Prods.*, 141 F.3d 1073, 1080, 46 USPQ 1277, 1280 (Fed. Cir.1998) (the on sale bar prevents commercial exploitation of the invention beyond the statutory term). For·instance, this court has often consulted evidence of monitoring to discern the distinction between experimental and commercial sales. *TP Lab.*, 724 F.2d at 972; *Grain Processing Corp. v. Am. Maize–Prods. Co.*, 840 F.2d 902, 906, 5 USPQ2d 1788, 1792 (Fed. Cir.1988). In this case, Mr. Neitzke and Mr. Vierus both visited the dock that Mr. Greden purchased on several occasions. Moreover they made repairs for free. These facts show that the inventors were still working to detect and correct flaws in their invention.

This court and its predecessor have noted that experimentation negates a bar when the inventor tests claimed features of the invention. *In re Theis*, 610 F.2d 786, 793, 204 USPQ 188, 194 (CCPA 1979) ("It is settled law that ... experimental use ... does not apply to experiments performed with respect to non-claimed features of an invention."); *In re Brigance*, 792 F.2d 1103, 1109, 229 USPQ 988, 991–92 (Fed.Cir.1986). In *Manville Sales Corp. v. Paramount Sys. Inc.*, 917 F.2d 544, 550, 16 USPQ2d 1587, 1592 (Fed.Cir.1990), this court permitted the inventor to test the· invention for durability during winter although claims did not expressly mention durability or severe weather conditions. Instead this court reasoned that the nature of the invention (luminaires) required durability so that the claims' reference to the subject matter placed that topic within the proper frame of experimentation. In this case, the '055 patent claims a floating dock. These floating docks, by their nature, must endure all kinds of water condi-

tions, including choppy water created by weather and boating. The waters at Bass Camp, the location of Mr. Greden's dock, were much rougher than the waters in Mr. Neitzke's marina where he was testing other dock sections. Mr. Neitzke testified that he sold the dock to Mr. Greden to test how it would hold up under these more turbulent water conditions. In other words, Mr. Neitzke testified that he sold the dock to Mr. Greden to determine whether it was "capable of performing its intended purpose in its intended environment." *Gould*, 579 F.2d at 583.

■ Moreover, the dock that Mr. Greden purchased had rectangular shaped pylons. Mr. Neitzke and Mr. Vierus later changed the pylon shape of their dock design to frustoconical based on the results of their dock testing. EZ Dock claimed this frustoconical shape in claim 8 of the '055 patent. When an inventor can show changes during experimentation that result in features later claimed in the patent application, this evidence is a strong indication that the activities of the inventor negated any evidence of premature commercial exploitation of an invention ready for patenting. Again this evidence creates a genuine issue regarding whether the material facts support that the invention claimed in the '055 patent was ready for patenting at the time of the sale to Mr. Greden and regarding whether its sale was commercial or experimental.

In sum, during summary judgment, the trial court must weigh all evidence in the record in favor of the nonmovant. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. When viewed through this prism, EZ Dock has presented adequate evidence for a reasonable jury to find satisfied the factual predicate for experimental use and that the '055 patent thus is not invalid. The

district court's grant of summary judgment that the '055 patent is invalid due to an on-sale bar was, therefore, improper.

## CONCLUSION

This court vacates the district court's grant of summary judgment that the '055 patent is invalid due to an on-sale bar and remands for trial.

## COSTS

Each party shall bear its own costs.

*VACATED AND REMANDED.*

LINN, Circuit Judge, concurring.

While I concur both in the conclusion reached and in the reasoning expressed in the majority opinion, I write to express my additional views on the experimental use doctrine and to observe that on this record the facts make this a much closer case than the majority opinion might suggest.

## I

The experimental use doctrine permits an inventor to conduct testing to refine his invention without losing the right to obtain a patent, even if such testing occurs in the public eye. *Pfaff v. Wells Electronics, Inc.*, 525 U.S. 55, 64, 119 S.Ct. 304, 142 L.Ed.2d 261, 48 USPQ2d 1641, 1645 (1998). The experimental use doctrine arose as an exception to the traditional rule that an inventor loses the right to a patent if he puts the invention in public use or on sale before filing a patent application. *Id.,* quoting *Pennock v. Dialogue,* 27 U.S. (2 Pet.) 1, 24, 7 L.Ed. 327 (1829) ("[h]is voluntary act or acquiescence in the public sale and use is an abandonment of his right."). Congress codified the traditional rule as the "public use" and "on-sale" statutory bars of 35 U.S.C. § 102(b) and included in the statutory scheme a one-year grace period. The experimental use doctrine survived as a common law exception to those statutory bars. *Pfaff,* 525 U.S. at 64–65, 119 S.Ct. 304, 142 L.Ed.2d 261, 48 USPQ2d at 1646. The experimental use exception preserved the right to a patent if the purpose of a use made of an invention outside the one-year grace period was experimental as opposed to commercial:

> It is sometimes said that an inventor acquires an undue advantage over the public by delaying to take out a patent, inasmuch as he thereby preserves the monopoly to himself for a longer period than is allowed by the policy of the law; but this cannot be said with justice when the delay is occasioned by a *bona fide* effort to bring his invention to perfection, or to ascertain whether it will answer the purpose intended. His monopoly only continues for the allotted period, in any event; and it is the interest of the public, as well as himself, that the invention should be perfect and properly tested, before a patent is granted for it. Any attempt to use it for a profit, and not by way of experiment, for a longer period than two years before the application, would deprive the inventor of his right to a patent.

*Elizabeth v. Am. Nicholson Pavement Co.,* 97 U.S. 126, 137, 24 L.Ed. 1000 (1877).

The experimental use exception was, over time, reformulated as experimental use "negation" of the statutory bar of § 102(b), in which the burden of persuasion does not shift at any time to the patentee. *See TP Labs., Inc. v. Prof'l Positioners, Inc.,* 724 F.2d 965, 971, 220 USPQ 577, 582 (Fed.Cir.1984) ("it is incorrect to impose on the patent owner ... the

burden of proving that a 'public use' was 'experimental.' These are not two separable issues. It is incorrect to ask: 'Was it public use?' and then 'Was it experimental?' Rather, the court is faced with a single issue: Was it public use under § 102(b)?"). A "totality of the circumstances" test was used to determine whether the use was experimental or commercial in character. *See Western Marine Electronics, Inc. v. Furuno Elec. Co.*, 764 F.2d 840, 845, 226 USPQ 334, 337–38 (Fed. Cir.1985) ("the court will want to consider the totality of the circumstances relating to the character and extent of commercial activities, ... along with the character and extent of bona fide experimentation"). However, the "totality of the circumstances" test was discredited by the Supreme Court, and, with respect to the on-sale bar, replaced with a two-part test. *Pfaff*, 525 U.S. at 66–67 & n. 11, 119 S.Ct. 304, 142 L.Ed.2d 261, 48 USPQ2d at 1646–47 & n. 11.

The test announced by the Supreme Court in *Pfaff* set forth two conditions for application of the on-sale bar: "[f]irst, the product must be the subject of a commercial offer for sale.... Second, the invention must be ready for patenting." 525 U.S. at 67, 119 S.Ct. 304, 142 L.Ed.2d 261, 48 USPQ2d at 1646–47. The Supreme Court explained that the second prong is satisfied by either (a) "proof of reduction to practice before the critical date," or (b) "proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." *Id.* at 67–68, 119 S.Ct. 304, 48 USPQ2d at 1647. The first prong of the *Pfaff* test focuses on the commercial characteristics, if any, of the individual transaction. A resolution of the first prong depends on an objective assessment of the facts surrounding the transaction. The inventor's subjective intent to experiment is not sufficient. *See Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*, 984 F.2d 1182, 1186, 25 USPQ2d 1561, 1564 (Fed.Cir.1993) (citing *TP Labs.*, 724 F.2d at 972, 220 USPQ at 583 ("the expression by an inventor of his subjective intent to experiment, particularly after institution of litigation, is generally of minimal value")). In contrast, the second prong focuses on the invention as a whole, implicating the invention's stage of development. It is only after the development of the invention has progressed to the stage where it is "ready for patenting," that the second prong of the *Pfaff* test can be said to be satisfied.

Before *Pfaff*, reduction to practice was a central focus of both the on-sale bar and experimental use negation thereof. *See, e.g., Seal–Flex, Inc. v. Athletic Track & Court Constr.*, 98 F.3d 1318, 1324, 40 USPQ2d 1450, 1454 (Fed.Cir.1996). The coincidence of reduction to practice as a focal point for both aspects brought a symmetry, and often a simplicity, to the analysis. An invention could be the subject of an experimental use anytime up to reduction to practice. *RCA Corp. v. Data Gen. Corp.*, 887 F.2d 1056, 1061, 12 USPQ2d 1449, 1453 (Fed.Cir.1989). Once reduced to practice, the invention could not be the subject of an experiment that would negate an on-sale bar. *Atlantic Thermoplastics Co., Inc. v. Faytex Corp.*, 5 F.3d 1477, 1480, 28 USPQ2d 1343, 1346 (Fed.Cir. 1993). Conversely, an invention seldom would trigger an on-sale bar prior to the time it was reduced to practice. Because events that might be experimental in nature were only those occurring prior to the time the invention in question was reduced to practice, i.e., only during the experimental stage leading up to a reduction to prac-

tice, the distinction between a sale made for experimental purposes and a sale made during the experimental stage of an invention's development was often more academic than real.

After *Pfaff*, the coincidence of the transitional event of reduction to practice as a focal point for both the on-sale bar and the experimental use doctrine changed. What *Pfaff* made clear is that the triggering event for an on-sale bar is not reduction to practice, but the advancement of the invention to the stage where it is "ready for patenting." Because nothing in *Pfaff* altered the transitional significance of reduction to practice for experimental use negation, the heretofore complementary nature of the two tests and the symmetry that such congruence brought to the analytical framework disappeared. Traversing this new landscape now demands in each case a careful examination of the purpose of the use contemplated in a potentially barring sale, not merely that the invention then may be in an experimental stage, and signals a shift in focus from the second prong to the first in evaluating experimental use negation.

*Pfaff* changed the test for when an on-sale bar is triggered, but it did not change the experimental use doctrine or the timing or nature of events giving rise to an experimental use exception. "The law has long recognized the distinction between inventions put to experimental use and products sold commercially." *Pfaff*, 525 U.S. at 64, 119 S.Ct. 304, 142 L.Ed.2d 261, 48 USPQ2d at 1645. The Supreme Court stated that application of the on-sale bar of § 102(b) continues to turn on whether the inventor's use of the invention was commercial or experimental. *Id.* at 64–65, 525 U.S. 55, 119 S.Ct. 304, 142 L.Ed.2d 261, 48 USPQ2d at 1645–46. In particular, the

Court discussed the experimental use doctrine in connection with the first part of the *Pfaff* test in evaluating whether the invention was the subject of a commercial offer for sale:

> The experimental use doctrine, for example, has not generated concerns about indefiniteness, and we perceive no reason why unmanageable uncertainty should attend a rule that measures the application of the on-sale bar of § 102(b) against the date when an invention that is ready for patenting is first marketed commercially. In this case ... there is no question that the sale was commercial rather than experimental in character.

*Pfaff*, 525 U.S. at 67, 119 S.Ct. 304, 142 L.Ed.2d 261, 48 USPQ2d at 1646–47.

It bears repeating that what is important to an assessment of the commercial versus experimental significance of a sale is not necessarily the posture of the invention's overall development, but the nature or purpose of the particular use to which the invention that is the subject of that sale is to be put. *See Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 550, 16 USPQ2d 1587, 1592 (Fed.Cir. 1990) ("a sale that is primarily for experimental purposes, as opposed to commercial exploitation, does not raise an on sale bar"); *U.S. Envt'l Prods., Inc. v. Westall*, 911 F.2d 713, 716, 15 USPQ2d 1898, 1901 (Fed.Cir.1990) ("[a] section 102(b) bar is avoided if the primary purpose of the sale was experimental"); *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 839, 221 USPQ 561, 567 (Fed.Cir.1984) (quoting *In re Theis*, 610 F.2d 786, 793, 204 USPQ 188, 194 (CCPA 1979) ("[t]he experimental exception applies only if the commercial exploitation is merely incidental to the primary purpose

of experimentation to perfect the invention")).

Thus, the question posed by the experimental use doctrine, assessed under the first prong of the two-part on-sale bar test of *Pfaff,* is not whether the invention was under development, subject to testing, or otherwise still in its experimental stage at the time of the asserted sale. Instead, the question is whether the transaction constituting the sale was "not incidental to the primary purpose of experimentation," i.e., whether the primary purpose of the inventor at the time of the sale, as determined from an objective evaluation of the facts surrounding the transaction, was to conduct experimentation. *Scaltech, Inc. v. Retec/Tetra, L.L.C.,* 178 F.3d 1378, 1384 n. 1, 51 USPQ2d 1055, 1059 n. 1 (Fed.Cir. 1999). As noted, once the invention is reduced to practice, there can be no experimental use negation. *Zacharin v. United States,* 213 F.3d 1366, 1369, 55 USPQ2d 1047, 1050 (Fed.Cir.2000); *RCA Corp. .,* 887 F.2d at 1061, 12 USPQ2d at 1453. But up to that point, regardless of the stage of development of the invention, and quite apart from the possible satisfaction of the second prong of the *Pfaff* test, the inventor is free to experiment, test, and otherwise engage in activities to determine if the invention is suitable for its intended purpose and thus satisfactorily complete. Furthermore, because the statutory bar of § 102(b) is evaluated on a claim-by-claim basis, the fact that an additional feature covered in a dependent claim may result from the sale of an invention covered in a parent claim does not mean that the parent claim may escape a statutory bar based on that sale. *See Lough v. Brunswick Corp.,* 86 F.3d 1113, 1122 n. 5, 39 USPQ2d 1100, 1107 n. 5 (Fed.Cir.1996) ("[e]ach claim of the patent must be considered individually when evaluating a public use bar.").

In determining whether a use is commercial versus experimental, this court has considered a variety of factors relevant to the first part of the *Pfaff* test, including: (1) the necessity for public testing, (2) the amount of control over the experiment retained by the inventor, (3) the nature of the invention, (4) the length of the test period, (5) whether payment was made, (6) whether there was a secrecy obligation, (7) whether records of the experiment were kept, (8) who conducted the experiment, and (9) the degree of commercial exploitation during testing. *See Baker Oil Tools, Inc. v. Geo Vann, Inc.,* 828 F.2d 1558, 1564, 4 USPQ2d 1210, 1214 (Fed.Cir.1987). We have also considered: (10) whether the invention reasonably requires evaluation under actual conditions of use, (11) whether testing was systematically performed, (12) whether the inventor continually monitored the invention during testing, and (13) the nature of contacts made with potential customers. *See Seal–Flex,* 98 F.3d at 1323, 40 USPQ2d at 1453–54.

While the Supreme Court in *Pfaff* discarded the "totality of the circumstances" test for determining the existence of an on-sale bar, 525 U.S. at 66 n. 11, 119 S.Ct. 304, 142 L.Ed.2d 261, 48 USPQ2d at 1646 n. 11, nothing in the Supreme Court's opinion suggests that a weighing of the factual submissions of the parties, particularly on the first prong of the *Pfaff* test, is precluded. *See Weatherchem Corp. v. J.L. Clark, Inc.,* 163 F.3d 1326, 1333–34, 49 USPQ2d 1001, 1007 (Fed.Cir.1998) (weighing facts in applying *Pfaff* ). To the contrary, the balancing of such facts lies at the heart of what has been termed "experimental use negation." *See TP Labs.,* 724 F.2d at 971, 220 USPQ at 582.

## II

In the present case, there is no genuine issue of material fact in dispute as to the

satisfaction of the second prong of the *Pfaff* test. The dock prototypes covered by claim 1 were far more than "drawings or other descriptions of the invention" and were sufficiently specific "to enable a person skilled in the art to practice the invention." *See Pfaff*, 525 U.S. at 67–68, 119 S.Ct. 304, 142 L.Ed.2d 261, 48 USPQ2d at 1647; *Robotic Vision Sys., Inc. v. View Eng'g, Inc.*, 249 F.3d 1307, 1312–13, 58 USPQ2d 1723, 1726 (Fed.Cir.2001). Thus, the only question is whether Schafer presented enough evidence to meet its burden on the first prong; i.e., to show by clear and convincing evidence, resolving all reasonable doubts in favor of EZ Dock, that the single sale to Mr. Greden was a commercial sale not incidental to the primary purpose of experimentation.

On the facts presented, I think this is a much closer case than the majority opinion might suggest. The evidence of record makes it difficult to conclude that the primary purpose of the sale to Mr. Greden was experimentation. The sale to Mr. Greden was a commercial sale of an existing structure without assurances demanded or obtained by the seller that the docks would remain at Bass Camp for any length of time or would be subjected to any sort of test in the turbulent water conditions later asserted to be important. There were no limitations placed on the use to be made of the docks by Mr. Greden or his father. There were no requirements that the docks remain at the location where the docks were originally placed. There were no restrictions to prevent re-sale, and no effort to impose on Mr. Greden, Mr. Greden's father, or any transferee any obligation to assist or permit testing of any sort. There were no particular tests contemplated nor a period of time envisioned over which the tests would be undertaken. None of the evidence presented by either

party shows control by the inventors over this alleged "experiment." "[A] use cannot be experimental if the inventor failed to maintain sufficient control over the invention and its testing." *Lough v. Brunswick Corp.*, 103 F.3d 1517, 1526, 41 USPQ2d 1385, 1393 (Fed.Cir.1997) (declining suggestion for rehearing en banc) (Michel, J., dissenting); *Paragon*, 984 F.2d at 1187, 25 USPQ2d at 1565. *See also* Rooklidge and Jensen, *Common Sense, Simplicity and Experimental Use Negation of the Public Use and On Sale Bars to Patentability*, 29 J. Marshall L.Rev. 1, 29 n. 144 (1995). The record in this case not only fails to show "sufficient control," it is devoid of any control by the inventors after the sale transaction was consummated.

The majority opinion points out that Mr. Greden initiated the purchase in the absence of any commercial marketing activity by the inventors, did not pay full market price for the dock, and received free installation and free repair services. But those facts are just as consistent with an arms-length commercial sale as they are with an experiment apparently undefined in scope or extent. I concur in the result only because the case is before us on summary judgment and we must view the evidence in a light most favorable to the non-movant, here EZ Dock. It is therefore appropriate that we return the case to the fact finder for a more complete assessment of the relevant facts and a more thorough weighing of the evidence bearing on Schafer's burden to show by clear and convincing evidence that the sale to Mr. Greden was a commercial sale not incidental to the primary purpose of experimentation.