**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MAGNETAR TECHNOLOGIES CORP., a Nevada corporation, *Plaintiff-Appellant/ Cross-Appellee*, v. INTAMIN, LTD., a Maryland corporation, *Defendant-Appellee/ Cross-Appellant*. | Nos. 13-56119 13-56333 D.C. No. 8:07-cv-01052- GAF-JCG OPINION |

Appeal from the United States District Court
for the Central District of California
Gary A. Feess, District Judge, Presiding

Argued and Submitted
June 2, 2015—Pasadena, California

Filed September 14, 2015

Before: Milan D. Smith, Jr. and N. Randy Smith, Circuit
Judges and Royce C. Lamberth,[*] Senior District Judge.

Opinion by Judge Milan D. Smith, Jr.

---

[*] The Honorable Royce C. Lamberth, Senior District Judge for the U.S.
District Court for the District of Columbia, sitting by designation.

## SUMMARY[**]

### Malicious Prosecution / Antitrust

The panel affirmed the district court's summary judgment on claims of (1) malicious prosecution of a patent infringement action and (2) monopolization in violation of Section 2 of the Sherman Antitrust Act.

The panel held that under California law, the defendant did not maliciously prosecute the plaintiff for infringement of a magnetic braking system patent because a reasonable attorney could have concluded that the on-sale bar of 35 U.S.C. § 102 did not apply to invalidate the patent.

Affirming the district court's grant of summary judgment on the plaintiff's claim that the defendant, along with its European affiliate corporations, used the invalid patent to monopolize the market for magnetic braking systems, the panel held that the plaintiff failed to establish a causal antitrust injury stemming from the defendant's actions.

On cross-appeal, the panel affirmed the district court's denial of the defendant's motion for sanctions under Fed. R. Civ. P. 37 against the plaintiff for bringing a frivolous antitrust action.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Maxwell M. Blecher (argued), Harold R. Collins, Blecher, Collins, Pepperman, and Joye, P.C., Los Angeles, California, for Plaintiff-Appellant/Cross-Appellee.

Gerald E. Hawxhurst (argued), Daryl M. Crone, David S. Harris, Crone, Hawxhurst LLP, Los Angeles, California, for Defendant-Appellee/Cross-Appellant.

---

**OPINION**

M. SMITH, Circuit Judge:

Plaintiff-Appellant/Cross-Appellee Magnetar Technologies Corporation (Magnetar) alleges that Defendant-Appellee/Cross-Appellant Intamin Limited (Intamin) maliciously prosecuted a patent infringement action against it, asserting U.S. Patent No. 6,062,350 ('350 Patent). Magnetar claims that Intamin prosecuted the action even though the '350 Patent was invalid pursuant to the on-sale bar of 35 U.S.C. § 102 (on-sale bar). Magnetar also contends that Intamin, along with its European affiliate corporations, used the invalid '350 Patent to monopolize the market for magnetic braking systems, in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1–7 (Sherman Act).

The district court granted summary judgment to Intamin, holding that a reasonable attorney could have concluded that the on-sale bar did not apply to the '350 Patent, and that Intamin thus could not have maliciously prosecuted Magnetar for patent infringement. The district court also ruled that

Magnetar had offered insufficient evidence to prove an antitrust injury in its antitrust claims against Intamin.

In its cross-appeal, Intamin contends that the district court erred by not imposing Rule 37 sanctions against Magnetar for bringing a frivolous antitrust action against Intamin. The district court denied Intamin's motion for sanctions, concluding that Magnetar brought its antitrust claims in good faith.

We affirm the decision of the district court.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.  Factual Background

#### A.  The Parties

Magnetar is a corporation organized and existing under the laws of Nevada, with its principal place of business in California. Magnetar manufactures and distributes magnetic brakes and braking systems for use on roller coaster rides.

Intamin is a corporation organized and existing under the laws of Maryland, with its principal place of business in Maryland. Intamin is affiliated with Intamin AG, located in Switzerland, and Ride Trade Corp., located in Liechtenstein. The three corporations design and build roller coaster rides for use in amusement parks.

#### B.  The "Hellevator"

On September 14, 1994, Intamin entered into a written "Ride Manufacture/User Agreement" with Kentucky

Kingdom, an amusement park located in Kentucky, concerning a ride named the "Hellevator." The agreement described the braking system to be installed on the ride as "fin brakes," a type of mechanical braking system.

On October 11, 1994, Intamin entered into a written "Letter Agreement" with Kentucky Kingdom that augmented the September 1994 sales contract. The October 11 agreement required that Intamin deliver the Hellevator to Kentucky Kingdom during the 1995 amusement park season. The agreement also prohibited Intamin from selling the ride to regional competitors of Kentucky Kingdom until 1997.

On October 19, 1994, Intamin sent a fax to Kentucky Kingdom providing details about the braking system to be installed on the Hellevator: "INTAMIN is planning to have the braking executed by a newly developed magnetic brake unit which does not physically enter in contact with the vehicles." Kentucky Kingdom subsequently issued a press release stating that the Hellevator would use "an innovating braking system . . . and does not include the traditional 'run-out' found in existing free-fall rides." Unlike mechanical braking systems, "[m]agnetic brakes create 'eddy currents' when a conductor passes through a gap between two sets of magnets. These eddy currents, in turn, create a magnetic friction that slows and stops the car attached to the conductor." *Intamin, Ltd. v. Magnetar Techs., Corp.*, 483 F.3d 1328, 1330 (Fed. Cir. 2007) (*Intamin II*).[1]

---

[1] The district court entered the judgment at issue in *Intamin II* on July 19, 2005. *Intamin, Ltd. v. Magnetar Techs., Corp.*, No. 04-0511 GAF (C.D. Cal.) (*Intamin I*).

After the execution of the October 11, 1994 contract, Intamin began work on the Hellevator. Intamin also continued researching and testing the magnetic braking system mentioned in its October 19 fax. In his affidavit, Sandor Kernacs, President of Intamin, stated that Intamin did not deliver the Hellevator to Kentucky Kingdom on time "due to the extensive testing that the magnetic brake technology required. For this reason, Intamin was forced to pay Kentucky Kingdom a substantial penalty."

In March of 1995, Intamin published a report suggesting that it was still in the early stages of testing the magnetic braking system, and that the system was not yet ready for use on the Hellevator. At several points, the report noted that experiments were ongoing, and that the final parameters were not yet known.

One witness testified that the magnetic braking system was ready as early as October of 1994. In his affidavit, Ronald H. Berni, General Manager of Operations at Kentucky Kingdom, stated that "it was never contemplated that the braking system for the ride would be anything other than an eddy current magnetic braking system. The braking system shown on all technical drawings for the Giant Drop Ride will verify this statement. No details on the technical drawings ever indicated an intent to install, or a means for installing mechanical brakes." On the other hand, Kentucky Kingdom's former CEO, Ed Hart, testified that it was possible for the braking mechanism on the Hellevator to have been either magnetic brakes or mechanical brakes. In October of 1995, Intamin completed construction on the Hellevator, using the magnetic braking system.

### C. The '350 Patent

On April 12, 1996, Intamin filed an application with the U.S. Patent and Trademark Office (PTO) for a patent on the magnetic braking system used in the Hellevator. Intamin's application was submitted on behalf of the inventors of the magnetic braking system, including Patrick Spieldiener, a director of Intamin. *See* '350 Patent. Intamin contends that it informed its patent counsel that it had initially proposed the magnetic braking technology in the Fall of 1994, when it contracted to provide the Hellevator to Kentucky Kingdom.

The PTO issued the '350 Patent on May 16, 2000. The inventors listed on the '350 Patent were: Alfons Saiko, Peter Rosner, Reinhold Spieldiener, Robert Spieldiener, and Patrick Spieldiener. *See* '350 Patent. Intamin acquired exclusive property rights in the '350 Patent on March 18, 2004, when four of the original five inventors assigned their rights to Intamin. *See Intamin, Ltd. v. Magnetar Techs. Corp.*, 623 F. Supp. 2d 1055, 1073 (C.D. Cal. 2009) (*Intamin III*).

### D. The Patent Infringement Action

In 2004, Intamin filed suit against Magnetar, contending that Magnetar had infringed the '350 Patent by selling "Soft Stop" brakes, a type of magnetic braking system. *See Intamin II*, 483 F.3d at 1331. The district court granted summary judgment to Magnetar, holding that the "Soft Stop" brakes did not infringe the '350 Patent because the components of the "Soft Stop" brake differed from those in the magnetic braking system Intamin had patented. *Id*. at 1332. The Federal Circuit reversed the grant of summary judgment and remanded the case to the Central District of California,

concluding that the district court had erred by relying on a narrow construction of the '350 Patent. *Id*. at 1337.

After remand, the district court again granted summary judgment to Magnetar, finding in part that Intamin had "unclean hands" concerning post-issuance assignment of the '350 Patent: "[D]espite not having been assigned any rights in the patent, Intamin began writing letters in 2001 to several companies claiming those companies had infringed Intamin's patent and threatening litigation if the companies did not compensate Intamin by purchasing a license." *Intamin III*, 623 F. Supp. 2d at 1072. The Federal Circuit affirmed the district court's second grant of summary judgment, per curiam. *See Intamin, Ltd. v. Magnetar Techs. Corp.*, 404 F. App'x 496 (Fed. Cir. 2010) (*Intamin IV*).

## II.  Prior Proceedings in this Action

On September 11, 2007, Magnetar filed its complaint in this action, alleging that Intamin had violated the Sherman Act by using a fraudulently-obtained patent to establish a monopoly in the market for magnetic braking systems. On January 21, 2011, Magnetar filed a Second Amended Complaint, to add a malicious prosecution claim, based on Intamin filing suit against Magnetar for patent infringement. The malicious prosecution claim is based on California law.

On May 28, 2013, the district court granted summary judgment to Intamin on both the malicious prosecution and Sherman Act claims. On the former claim, the court held that a reasonable attorney could have concluded that the on-sale bar did not apply to the '350 Patent. Because there was a legitimate dispute as to the applicability of the on-sale bar, Intamin had probable cause to bring its patent infringement

action. On the latter claim, the district court concluded that Magnetar's theory of antitrust injury was unreliable and speculative, and that Magnetar had not provided an adequate causal link between Intamin's purported anticompetitive conduct and Magnetar's damages. The district court also denied Intamin's Rule 37 motion for sanctions against Magnetar.

This timely appeal followed.

## JURISDICTION AND STANDARD OF REVIEW

The district court had subject matter jurisdiction over Magnetar's antitrust claims pursuant to 28 U.S.C. § 1331, and had supplemental jurisdiction over the malicious prosecution claim pursuant to 28 U.S.C. § 1337. We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

We review de novo the district court's decision to grant summary judgment to Intamin on the malicious prosecution and antitrust claims. We consider disputed material facts in the light most favorable to Magnetar, the non-moving party. Summary judgment is appropriate if no genuine issue of material fact exists, and Intamin is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

We review for an abuse of discretion the district court's decision not to sanction Magnetar under Rule 37. *See Comeaux v. Brown & Williamson Tobacco Co.*, 915 F.2d 1264, 1268 (9th Cir. 1990).

## DISCUSSION

### I.  Malicious Prosecution

Magnetar contends that Intamin maliciously prosecuted the patent infringement action, because Intamin brought the action despite knowing that the '350 Patent was invalid pursuant to the on-sale bar of 35 U.S.C. § 102.  To prevail on a claim of malicious prosecution, Magnetar must show that the patent infringement action: (1) was commenced by or at the defendant's direction and terminated in plaintiff's favor, (2) was brought without probable cause, and (3) was initiated with malice.  *See Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995);  *see also Sheldon Appel Co. v. Albert & Oliker*, 765 P.2d 498, 501 (Cal. 1989) (quoting *Bertero v. National General Corp.*, 529 P.2d 608, 613 (Cal. 1974)).

Whether probable cause exists in a malicious prosecution case is a legal question resolved by the court.  *Wilson v. Parker, Covert & Chidester*, 50 P.3d 733, 736 (Cal. 2002). The court's "inquiry is objective," *Estate of Tucker v. Interscope Records, Inc.*, 515 F.3d 1019, 1031 (9th Cir. 2008), asking whether a "reasonable attorney would have thought the claim tenable." *Sheldon Appel Co.*, 765 P.2d at 511.

In this case, we ask whether a "reasonable attorney would have thought" the on-sale bar did not apply to the '350 Patent. *See id*.  "[T]he on-sale bar applies when two conditions are satisfied before the critical date.  First, the product must be the subject of a commercial offer for sale. . . .  Second, the invention must be ready for patenting." *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67 (1998).

With regard to the '350 Patent, a reasonable attorney could have determined that the on-sale bar did not apply due to the genuine dispute concerning whether the magnetic braking system had been (1) offered for sale before the critical date; and (2) was ready for patenting before the critical date.  We address each of these issues in turn.

## A.  Offered for Sale More than One Year Prior

The on-sale bar of 35 U.S.C. § 102 provides that "no person is entitled to patent an 'invention' that has been 'on sale' more than one year before filing a patent application." *Pfaff*, 525 U.S. at 57.  Although our court has not delineated the precise boundaries of the "on sale" prong of 35 U.S.C. § 102 after the Supreme Court's controlling decision in *Pfaff*, the Federal Circuit has held that "[o]nly an offer which rises to the level of a commercial offer for sale, one which the other party could make into a binding contract by simple acceptance (assuming consideration), constitutes an offer for sale under § 102(b)." *Grp. One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1048 (Fed. Cir. 2001).  We are persuaded by the Federal Circuit's reasoning, and apply its holding here. We conclude that a reasonable attorney could have determined that the magnetic braking system was not part of Intamin's contract with Kentucky Kingdom and that the magnetic braking system was not commercially offered for sale more than one year prior to April 12, 1996.  *See Pfaff*, 525 U.S. at 67.

### 1.  The "Ride Manufacture/User's Agreement"

The September 14, 1994 contract between Intamin and Kentucky Kingdom did not constitute a commercial offer to sell the magnetic braking system described in the '350 Patent.

The contract specified that passengers on the Hellevator would be stopped by a "braking zone where they are stopped by a series of permanently closed fin brakes." Fin brakes are a form of mechanical brakes. The September contract further states elsewhere that "mechanical brakes" would be used.

### 2.  "Letter Agreement"

The October 11, 1994 letter agreement similarly does not support Magnetar's position that the magnetic braking system was sold by Intamin to Kentucky Kingdom. This document augments the September 14 contract, but it says nothing about the use of magnetic brakes on the Hellevator.

### 3.  October 19, 1994 Letter from Intamin AG

The October 19, 1994 letter from Patrick Spieldiener specified that magnetic brakes could be used on the Hellevator: "Contrary to previous descriptions INTAMIN is planning to have the braking executed by a newly developed magnetic brake unit which does not physically enter in contact with the vehicles." Nevertheless, a reasonable attorney could have determined that this letter does not constitute "a commercial offer for sale" of magnetic brakes. *Pfaff*, 525 U.S. at 67.

The language in the letter does not require that magnetic brakes be used on the Hellevator. Rather, Patrick Spieldiener states that Intamin is "planning" to use the magnetic brakes, which implies at least some uncertainty. Because the original contract stated that mechanical brakes would be used, the letter suggests only that Intamin would attempt to replace the mechanical brakes with magnetic ones.

Moreover, an attorney analyzing all the facts could determine that the original contract to provide mechanical brakes had not been modified by the October 19 letter. The parties do not dispute that Kentucky law applies to the contract because Kentucky is the place of performance, and Kentucky Kingdom is located in that state. Under Kentucky law, a modification is subject to the same requirements as the contract itself; namely, offer, acceptance, and consideration. *See Energy Home, Div. of S. Energy Homes, Inc. v. Peay*, 406 S.W.3d 828, 834 (Ky. 2013).

It is unclear whether the contract modification discussed in the letter was complete. "For the terms [of a modification] to be considered complete they must be 'definite and certain' and must set forth the 'promises of performance to be rendered by each party.'" *Id.* (quoting *Kovacs v. Freeman*, 957 S.W.2d 251, 254 (Ky. 1997)). Here, the letter does not refer to the original agreement nor does it clearly state that it is meant as an amendment to the original contract. The alleged modification was signed by Patrick Spieldiener, who did not state he was signing on behalf of Intamin Ltd., the party to the original contract. Patrick Spieldiener was also an officer of Intamin AG. In light of these facts, a reasonable attorney could have concluded that the letter did not modify the original contract, and that Intamin had only contracted to sell mechanical brakes to Magnetar.

## B.  Experimentation Exception

Even if we were to decide that a commercial offer for sale of the magnetic brakes was contained in the October 19 letter, a reasonable attorney could still have concluded that the magnetic braking system was not "ready for patenting" when the Hellevator was sold to Kentucky Kingdom. An invention

is "ready for patenting" if it has been "reduc[ed] to practice before the critical date . . . [or if] prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." *Pfaff*, 525 U.S. at 67–68.

The Federal Circuit has described "reduction to practice" as "proof that an invention will work for its intended purpose." *See EZ Dock, Inc. v. Schafer Sys., Inc.*, 276 F.3d 1347, 1352 (Fed. Cir. 2002). The Federal Circuit also held that ongoing experiments on an invention after the critical sale date can show that the invention had not been reduced to practice. *Id.* at 1352–53. We are persuaded by the reasoning of the Federal Circuit, and we adopt its holding on this issue.

There is ample evidence in the record showing that experiments on the magnetic brakes continued after the critical sale date. According to a report issued in March 1995—just one month before the critical date—the magnetic brake technology was still being studied, and the final parameters were unknown. Sandor Kernacs, President of Intamin, testified that experiments on the magnetic brake technology continued into June and July of 1995.

Magnetar argues that when an invention is reduced to practice, the applicability of the experimentation exception to the on-sale bar is negated. We agree that this is legally correct. *See, e.g.*, *Weatherchem Corp. v. J.L. Clark, Inc.*, 163 F.3d 1326, 1332 (Fed. Cir. 1998). In the present case, however, Magnetar needed to show that every reasonable attorney would have thought that the magnetic braking system had been reduced to practice, and thus, would have thought that the on-sale bar applied. Because Magnetar has

not made such a showing, it cannot prove that Intamin lacked probable cause to bring the patent infringement action against Magnetar.

## II. Sherman Act Antitrust Claims

We next turn to Magnetar's antitrust claims. Section 2 of the Sherman Act, 15 U.S.C. § 2, makes it illegal to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." The Sherman Act "prohibits efforts both to restrain trade by combination or conspiracy and the acquisition or maintenance of a monopoly by exclusionary conduct." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1214 (9th Cir. 1997).

Magnetar asserts three related antitrust claims based on Section 2 of the Sherman Act. First, it contends that Intamin, together with its European affiliates Intamin AG and Ride Trade Corp., obtained the '350 Patent through fraud on the PTO, and then entered into a conspiracy to eliminate competition in the market for magnetic braking systems. Intamin and its European affiliates purportedly eliminated competition by forcing other market participants to pay licensing and registration fees to Intamin, and threatening to file lawsuits based on the '350 Patent. Second, Magnetar claims that, by fraudulently obtaining the '350 Patent and subsequently using the '350 Patent to drive out competitors from the magnetic braking market, Intamin *attempted to* monopolize the magnetic braking market. Third, Magnetar contends that Intamin actually monopolized the business of manufacturing, selling, and distributing magnetic braking systems.

All three of Magnetar's alleged causes of action require it to show a causal antitrust injury.[2] We recognize that Intamin's conduct relating to the '350 Patent is problematic. A final decision of a district court concluded that "Intamin filed with the PTO fraudulent, back-dated assignments twice, once in 2005 and again in 2007, each of which purported to assign Intamin the rights to the '350 patent in 1997." *Intamin III*, 623 F. Supp. 2d at 1072. The present case, however, involves Magnetar's claims that Intamin knew the '350 Patent was invalid based on the on-sale bar, but then used the purportedly fraudulent '350 Patent to establish market power in the market for magnetic braking systems. Considering this specific set of claims only, we affirm the district court's decision granting summary judgment to Intamin because Magnetar has not alleged sufficient facts to show a causal antitrust injury stemming from Intamin's actions.

---

[2] To prove a conspiracy claim, Magnetar must demonstrate: "(1) the existence of a combination or conspiracy to monopolize; (2) an overt act in furtherance of the conspiracy; (3) the specific intent to monopolize; and (4) causal antitrust injury." *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003). To prevail on a claim of an attempt to monopolize, Magnetar must prove: (1) specific intent by Intamin to control prices or destroy competition; (2) predatory or anti-competitive conduct directed toward accomplishing that purpose; (3) a dangerous probability of success; and (4) causal antitrust injury. *See Image Tech. Servs., Inc.*, 125 F.3d at 1202. Finally, to hold Intamin liable for the actual monopolization of the market in magnetic braking systems, Magnetar has to show: (1) Intamin's possession of monopoly power in the relevant market; (2) the willful acquisition or maintenance of that power; and (3) causal antitrust injury. *See Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 998 (9th Cir. 2010).

## A.  Causal Antitrust Injury

Magnetar contends that Intamin caused two antitrust injuries: (1) lost profits resulting from Intamin's patent infringement lawsuit and other attempts to force Magnetar to pay licensing fees to Intamin, and (2) litigation costs Magnetar incurred in defending the patent lawsuit.  Magnetar, however, does not provide an estimate of the amount of damages that can be attributed to Intamin's anticompetitive conduct nor does it show that Intamin's conduct caused these damages.  *See City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1371 (9th Cir. 1992); *McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 808 (9th Cir. 1988).

### 1.  Lost Profits

To survive a motion for summary judgment, Magnetar must "provide evidence such that the jury is not left to 'speculation or guesswork' in determining the amount of damages to award."  *McGlinchy*, 845 F.2d at 811 (quoting *Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*, 773 F.2d 1506, 1509–10 (9th Cir. 1985)).  Magnetar does not carry this burden.  It has not submitted "expert witnesses or designated documents providing competent evidence from which a jury could fairly estimate" its lost profits.  *McGlinchy*, 845 F.3d at 808 (citing *Rickards v. Canine Eye Registration Found., Inc.*, 704 F.2d 1449, 1452 (9th Cir. 1983), *cert denied*, 464 U.S. 994 (1983)).

Magnetar's principal expert, Karl J. Schulze, did not provide an accurate estimate of the damages Magnetar suffered.  His expert calculation did little more than examine the difference between Magnetar's projected revenue, without considering the effects of Intamin's lawsuit, and Magnetar's

actual revenue, after the prosecution of the lawsuit. Put differently, Schulze only compared Magnetar's "actual [results] versus their business plan[, which] showed that they did not achieve their business plan." Schulze did not delve into the merits of the projected results. Instead, he took as a "base assumption" the projections Magnetar provided, and assumed that they were accurate. Accordingly, the district court correctly found that there was no "independent assessment of the validity of Magnetar's projected revenues."

After being deposed, Schulze submitted an affidavit in which he stated that he had reviewed the merits of Magnetar's projected business plan. For example, he stated, "I reviewed in detail Magnetar's prior operating history to ascertain performance and trends in revenue, gross margin and costs, as well as to confirm that Magnetar had significant experience in the industry and line of business in which it planned to continue operating." Even if we accept the affidavit as true, neither Schulze's deposition testimony, nor his affidavit, estimated the portion of Magnetar's overall losses that could be attributed to the patent lawsuit. Several other factors could have contributed to Magnetar's losses, such as the decline in profits in the amusement ride business, or the decline of the U.S. economy generally. These alternative causes would have exacerbated the loss of profits purportedly caused by the patent litigation.

Second, Magnetar's evidence does not segregate the losses . . . caused by acts which were not antitrust violations from those that were. *See City of Vernon*, 955 F.2d at 1372. Because Schulze similarly did not make an effort to separate the losses suffered as a result of Intamin's conduct from the total losses suffered by Magnetar, it would have been impossible for a jury to estimate the lost profits attributable

to Intamin's conduct.  *See id.* at 1373 ("[T]here is no indication of what part of that $80,000 loss of savings was due to proper interruptions of service and what part to improper ones, or for that matter, due to other factors entirely.").

Finally, Magnetar has not proven "in a reasonable manner the link between the injury suffered and the illegal practices of the defendant." *Id.* at 1371 (quoting *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1161 (7th Cir. 1983)). None of Magnetar's expert witnesses established this causal link.  As noted *supra*, Schulze's expert testimony made no effort to separate the damages attributable to the patent action from other possible causes of losses.  Similarly, Mark Hanlon, an industry expert with an engineering background, did not address the issue of causation.  He only testified concerning the types of braking systems used in amusement park rides, and the engineering features of magnetic brakes.

Edward M. Pribonic, President of Magnetar, also failed to provide evidence that Intamin caused Magnetar to lose profits.  He only testified conclusorily that, "[a]fter Intamin Ltd. filed its malicious lawsuit for patent infringement against Magnetar, Magnetar's business and reputation were severely damaged.  Magnetar struggled on for three years, at first trying to maintain its growth, but as time went on, just trying to survive.  The enormous expense of the litigation defense crippled Magnetar's efforts to continue product development or marketing."  At best, Pribonic's testimony only showed a correlation between the beginning of the patent litigation and losses suffered by Magnetar.

Magnetar also submitted affidavits from potential customers, which stated that they were wary of "potential

litigation" and therefore, decided not to purchase magnetic brakes from Magnetar.  Such evidence does not provide a clear causal link to losses suffered by Magnetar.  We note that companies such as Magnetar's customers routinely confront "potential litigation," especially when someone in the industry applies for a patent.

We affirm the district court's decision granting summary judgment to Intamin on the issue of lost profits.  Magnetar fails to prove a "direct causal connection between the alleged violation and the alleged injury," as required by the Sherman Act.  *Hairston v. Pac. 10 Conference*, 101 F.3d 1315, 1322 (9th Cir. 1996).

### 2.  Litigation Costs

Magnetar next contends that the litigation expenses it incurred defending itself against the patent litigation constitute an antitrust injury.  *See Rickards*, 783 F.2d at 1334–35; *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986, 988–89 (9th Cir. 1979).  We agree with Magnetar that, unlike lost profits, its litigation expenses are not speculative.  However, to succeed in an antitrust claim based on litigation expenses, Magnetar must show that the patent lawsuit was a sham, based on the clear application of the on-sale bar to the '350 Patent.  *See Rickards*, 783 F.2d at 1335.  As we determined *supra*, a reasonable attorney could have determined that Intamin's patent lawsuit was viable and that the on-sale bar did not apply to the '350 Patent.

The district court did not err in granting summary judgment to Intamin on the antitrust claims because Magnetar has not submitted sufficient evidence of a causal antitrust injury.

## III.      Rule 37 Sanctions

On cross-appeal, Intamin contends that the district court erred in denying its request for attorney's fees and costs under Rule 37.  Intamin claims that Magnetar should be sanctioned because it could not prove antitrust injury and damages. Although Intamin served requests for admission on Magnetar, including requests to admit that it had not been "injured in its business or property" by antitrust violations, Magnetar did not admit these facts.

Fed. R. Civ. P. 37(c)(2) states that  "[i]f a party fails to admit what is requested under Rule 36 and if the requesting party later proves a document to be genuine or the matter true, the requesting party may move that the party who failed to admit pay the reasonable expenses, including attorney's fees, incurred in making that proof."  Here, the issue is not whether Magnetar prevailed in the litigation but whether it acted reasonably in believing that it might prevail. *See Wash. State Dept. of Transp. v. Nat. Gas Co.*, 59 F.3d 793, 805–06 (9th Cir. 1995).

The district court did not sanction Magnetar because it concluded that Magnetar had reasonable grounds to bring the antitrust action.  We agree with the district court.  Although we hold that Magnetar did not offer enough evidence to establish a causal antitrust injury, we recognize that potentially valid arguments could have been made on both sides of this issue.  Accordingly, we conclude that Magnetar proceeded in good faith in not admitting facts related to the antitrust injury.

## IV.     Conclusion

We affirm the district court's decision granting summary judgment to Intamin on the malicious prosecution and Sherman Act claims.  We also affirm the district court's ruling denying Rule 37 sanctions against Magnetar.

Each party shall bear its own costs on appeal.

**AFFIRMED.**